IN THE MATTER OF THE APPLICATION OF THE SUPER-
INTENDENT OF ELECTIONS IN HUDSON COUNTY FOR
AN ORDER TO OBTAIN THE PRODUCTION OF POLL
BOOKS PURSUANT TO CHAPTER 196 OF THE LAWS
OF 1940.

Argued September 30, 1940—Decided October 12, 1940.

Before BROGAN, CHIEF JUSTICE, sitting as statutory agent.

For the municipal clerk, *Charles A. Rooney.*

For the Superintendent of Elections, *Jacob J. Levey.*

BROGAN, CHIEF JUSTICE. On September 23d, this year, chapter 196, *Pamph. L.* 1940, became part of the general law of this state concerning elections. The said act was an amendment to *R. S.* 19:18-1 and thenceforth became part thereof. That amendment provided that the Superintendent of Elections in the counties of the first class "shall have access and be permitted to inspect and examine any and all poll books for said county for any election which may have been held or shall be held in said county," &c. Jurisdiction to compel compliance with these provisions of the amendment is expressly conferred upon any justice of the Supreme Court or any Common Pleas judge. *Cf.* 19:18-1, as amended.

A petition was presented to me, alleging, among other things, that demand, in writing, had been made upon the city clerk of Jersey City for the poll books used in the general

elections for the years 1936, 1937, 1938 and 1939; and that the municipal clerk refused to honor the said demand. An *ex parte* order was thereupon made directing that the poll books designated be produced in court. On the return of the order later the same day, the clerk produced the poll books for the years 1938 and 1939, and stated and offered proof that the poll books for the general election of 1936 had been burned up two years after that election and that the poll books of 1937 had been burned sometime early in the month of January, 1940.

The testimony that the poll books for the years 1936 and 1937 had been burned, as stated in the clerk's evidence, was not disputed or challenged in any way by proof to the contrary.

The issue presented is a narrow one. Jurisdiction of the matter is wholly statutory. The powers conferred upon the court are those of a legislative agent, to do that which the legislature, by the amendment, directs the court to do. The authority is set forth in this language: "Such justice or judge shall forthwith make an order directing the official having possession or custody of the said poll books to produce them at once in the court * * * and upon their being produced said justice or judge shall deliver the same to the Superintendent of Elections." The statute confers the jurisdiction and at the same time defines the limit thereof.

The Superintendent of Elections contends that it is the duty of the city clerk, under the Elections statute, to retain poll books for five years. The city clerk, to the contrary, says that it was incumbent upon him to retain poll books for a period of two years after the election at which they had been used. Both sides rely upon certain sections of the statute—*R. S. title* 19. These sections speak of registry books. Neither of these terms "registry book" or "poll book" is defined, as such, in any section of the statute; nor does either appear in the list of "words and terms" which are defined. *Cf.* 19:1-1. The question involved is the meaning of the statute on this issue.

The applicant invokes certain sections of the statute which provide that registry books may not be disposed of for a

period of five years and at the oral argument contended that the words "registry books" and "poll books" are synonymous terms. In his brief it is asserted that *"poll books are registry books"* and that therefore the clerk violated the statute which ordains that registry books shall be preserved for five years, by not preserving these poll books, relying on *R. S.* 19:18-7. A careful reading and comparison of the sections of the statute pertinent to this inquiry, however, compels the conclusion that the terms "registry books" and "poll books" are not synonymous or interchangeable, and that this section of the statute (*R. S.* 19:18-7) does not apply. The statute, in unmistakable terms, makes them out to be quite different election instrumentalities. An analysis of the controlling sections of our present elections statute, as well as previous statutes and revisions, makes this quite clear. In the interest of clarity some exposition of the general subject is necessary.

In counties of the first class in this state and in certain of the municipalities described in the Election law—19:31-1, *et seq.*—permanent registration obtains, *i. e.*, a voter once registered under the provisions of this section of the statute, *supra* (where such provisions control) shall be eligible to vote at any election subsequent to such registration, subject of course to a change in his qualifications which may later disqualify him. A qualified voter, where permanent registration is in effect, is required to sign both an original and a duplicate permanent registration form (19:31-3) ; and if such person fails to vote at a general election during four consecutive years "his original and duplicate permanent registration and record of voting forms shall be removed" to what is called the "inactive file" (19:31-5). If this happens, such person shall be required to re-register before being allowed to vote at any subsequent election. Of course it is apparent that the record of such registration is a permanent matter and in counties of the first class such record remains in the custody of the Commissioner of Registration (now Superintendent of Elections) *R. S.* 19:31-2. In addition to the original permanent registration a duplicate permanent registration is provided for, this latter for use of the members

of election boards on election day when the registrant presents himself to vote. At that time, and before receiving a ballot, the registrant is required to sign his name in the poll book and the signature then written is compared with his signature in the duplicate, permanent registration book; 19:15-15; and if the signature thus written in the poll book "is the same or sufficiently similar to the signature in the signature copy register, the voter shall be eligible to receive a ballot." From a reading of the section of the statute last mentioned, it is not open to argument but that the poll book used at an election is not the same as the signature copy register and that the terms are not interchangeable. The signature in the poll book is the voter's proof or demonstration that he is the person a record of whose signature is permanently in the signature copy register.

A reading of other sections of the statute—for instance, 19:31-10—removes all doubt but that these books are separate and distinct parts of the election machinery. From this section of the statute, it is perceived that when a registrant presents himself for permanent registration he is required to sign an original and duplicate permanent registration form, the former of which is the permanent office record of the Commissioner of Registration as that official was known up to the passage of the amendment of July 2d, 1940 (*Cf.* 19:31-2, as amended by chapter 165, *Pamph. L.* 1940), and the latter which was designed for use in the several polling places on election day. The original permanent registration forms may not be removed from the office of the Commissioner of Registration (now Superintendent of Elections) except upon the order of a court of competent jurisdiction. *R. S.* 19:31-10. And it is also to be noted that in this section the legislature describes the duplicate permanent registration forms and the corresponding record of voting forms; and these the statute ordains "shall constitute and be known as the signature copy registers." Manifestly this is something totally different from a poll book. It is apparent then that a registry book has a distinct statutory significance and meaning.

Counsel for the municipal clerk, relying on the same section of the statute (19:18-7) invoked by counsel for the Superintendent of Elections, argued that this section is controlling and justifies the action of the clerk. It provides that all "registry books and statements of results of elections required to be filed with the Secretary of State, the county clerks of the various counties and the municipal clerks of the various municipalities shall be preserved by such officials for a period of five years after the holding of any election at which they were used, and all ballots, used or unused, for any election shall be preserved * * * for a period of two years after the holding of any election, and thereafter shall be sold by such officials as waste paper," &c., and "the several county and municipal clerks may also sell all registry books which have been on file in their office for a period of five years * * *." This contention would require no discussion save for the fact that each contestant argues that the section is authority for his position. I think it has no application at all to the issue here, but that it applies only in those subdivisions of the state in which permanent registration does *not* obtain. That this is so seems clear from the language of the statute itself because a registry book is never filed with the clerk of any municipality in which there is permanent registration. *R. S.* 19:31-22. And, further, this inquiry concerns poll books, and a registry book, which in certain municipalities must be kept for five years, is not a poll book.

The statute—*R. S.* 19:18-1—provides that as soon as an election shall be finished and the vote canvassed, &c., in municipalities *not* having permanent registration, the general election poll book shall *not* be placed in the ballot box but shall be delivered to the county clerk, while in municipalities having permanent registration such poll book shall *not* be placed in the ballot box but shall be delivered immediately by the district board to the Commissioner of Registration who shall forward such poll books to the municipal clerks not later than one month before the next general election.

An examination of the old law, *i. e.*, prior elections statutes, in an inquiry of this kind is helpful because it often shows

the development of a legislative policy and the meaning which the legislature itself has ascribed to certain terms. For that purpose we advert to the Revision (Election law) of 1898 (chapter 139, *Pamph. L.* 1898) and turn to section 67, page 271. At that time permanent registration was unknown in this state, but there it will be noted that there was entered in the *poll book* the name and address of the person offering his vote and that the clerk of elections had before him a register of voters, which was a list of the names of qualified voters compiled prior to the election by the Board of Registry and Election, and that the names were checked in the register after making entry of the name and address of the voter in the poll book. *Cf. Rev.* 1898, *p.* 248, § 24; *pp.* 242, §§ 15, *et seq.,* &c.; also *Supp.* 1908, *ch.* 16, *p.* 30. A register of voters, under the 1898 revision possessed some of the uses which a signature copy register, under the present law, now has.

Another revision of the election law was accomplished in 1920 (see chapter 349, *Pamph. L.* 1920, *p.* 615). Article XI, at page 655, paragraph 2, clearly indicates that registry books were made up prior to an election and contained a list of qualified voters; in the same act (see section 9, page 659) this register is defined as "the signature copy register;" in section 21, page 665, we find provision for the revision and correction of registers in all municipalities, which is done prior to election, the times being fixed by this section of the statute; and article XV, section 5, page 699, makes it evident that the register is the list of persons whose names appear thereon as *eligible* to vote; in section 11, page 701, a poll book is described; in article XVIII, section 1, page 722, we find provision that the poll book, &c., be placed in the ballot box, which ballot box is delivered to the municipal clerks; in article XVIII, section 4, page 723, it is provided that the contents of these boxes, *i. e.,* ballots, used and unused. &c., and poll books, be preserved for two years, while registry books (section 7, page 723) had to be retained for five years. These distinctions in character and use between registry books and poll books might be multiplied.

Another revision of the Election law was passed in 1930 (chapter 187, *Pamph. L.* 1930, *p.* 671). Prior to that revision, *i. e.,* in 1926, permanent registration became part of the election machinery in certain parts of this state. By article XVII, paragraph 216, section 1 (*Revision* 1930, *p.* 772), in municipalities *not* having permanent registration, the general election poll book was ordered placed in the ballot box, but in municipalities having permanent registration the general poll books "shall *not* be placed within the ballot-box but shall be delivered to the municipal clerk along with and in like' manner as the ballot-box as hereafter provided." The contents of the ballot box had to be preserved for two years (paragraph 219, section 4, page 773) and by paragraph 220, section 5, the municipal clerks in municipalities having permanent registration, to whom the poll books were delivered, had the duty to deliver such books to the Commissioner of Registration within ten days after the general election, who was obliged to return such poll books to the clerk not later than one month preceding the next general election.

By another section of the 1930 revision, *i. e.,* paragraph 221, section 6, in municipalities *not* having permanent registration, it is provided that not later than noon of the day following the canvass of the votes, the register of voters should be filed by the boards with the municipal clerk; and by paragraph 223, section 8, these registry books had to be retained by the municipal clerk for a period of five years. This provision, which is the same as the existing law, clearly is general, and applies only to municipalities in which the city clerk has the register of voters, *i. e.,* in those municipalities where permanent registration does not obtain.

Permanent registration was written into law in 1926 (see chapter 328, page 714). It became part of the actual election machinery in the places where it was applicable in 1927. A careful examination of the election laws from the time permanent registration became effective until the 1930 revision shows no direction by the legislature as to the length of time that the poll books were to be retained. This much, however, seems to be indisputably clear: (1) that poll books

and registry books are separate and distinct parts of records of the election machinery and are not one and the same thing; (2) that from the Revision of 1898 through the subsequent amendments and revisions and up to the year 1930 the poll books were deposited in the ballot box with the used and unused ballots and delivered to the municipal clerks, and the law then in force required that the contents of these ballot boxes be preserved for two years. No change in these regulations appeared until 1931 (*Pamph. L.* 1931, *ch.* 374, *p.* 954, ¶ 216, § 1); the Revision of 1930 was then amended and the poll books, after an election, went to the Commissioner of Registration who might retain them for eleven months, or until one month before the next general election, at which time he was obliged to forward them to the municipal clerks. The theory of lodging the poll books with the Commissioner of Registration was to afford that official ample time to compare the poll book signature with the authenticated signature of the voter which permanent record that officer at all times retained. The Commissioner of Registration in this way had the opportunity to report irregularities or illegal voting, disclosed by such comparison, to the criminal authorities. No statute that we have been able to find or which has been mentioned by counsel for the parties fixed the length of time that the municipal clerk should retain poll books after they had been forwarded to him by the Commissioner of Registration. Even the amendment to the statute, enacted into law September 23d, 1940, under which this proceeding is had, is silent in this particular. Nothing appears in this amendment to indicate for what precise period of time a municipal clerk is required to retain poll books. There is, of course, since this amendment, the plain inference that if the Superintendent of Elections calls for the poll books used in *any* election that has been held, or any election that in the future may be held, it is the duty of the clerk to produce them. The amendment assumes that a municipal clerk has such books.

The brief of the Superintendent of Elections, in support of his view that registry books and poll books should be held

to be the same, cites sources outside the statute. This is no aid to the court if, as here, the statute and the general legislative expression on the subject make the meaning of the terms clear. The language under consideration does not require construction since it is not of doubtful meaning. A strained construction cannot be adopted in order to give effect to what a court may think is the unexpressed intention of the legislature. *Public Service, &c.,* v. *State Board of Tax Appeals,* 115 *N. J. L.* 97; duties must be created by express language to accomplish that end (compare *Fidelity and Deposit Co., &c.,* v. *McClintic-Marshall Co.,* 115 *N. J. Eq.* 470; *affirmed,* 117 *Id.* 440; *U. S. Cas. Co.* v. *Hyrne,* 117 *N. J. L.* 547, &c.).

On the other hand, if any doubt existed as to the meaning of the statutory words, the history of the subject, *supra,* would dissipate it.

"There is a presumption against a legislative intention, by a revision of general laws, to effect a change of substance. That presumption is not, *ex necessitate,* overcome by mere change of phraseology, or the addition or omission of words in the revision; the intention to alter the essence must be expressed in language admitting of no reasonable doubt of the purpose." *Crater* v. *Somerset County,* 123 *N. J. L.* 407, 414.

Before closing, one further argument of the Superintendent of Elections, viz., that for a statutory reason poll books and registry books should be held to be synonymous, should be mentioned. The superintendent says that it is necessary that poll books be kept for five years so that he, in the discharge of his duty, may determine the persons who had not voted for four years and who consequently should thereafter be disqualified until they have re-registered. This argument has no merit whatever. Poll books are not necessary for this purpose and the statute ascribes no such function to them. The Commissioner of Registration (now Superintendent of Elections) has in his possession the signature copy registers, the "original voting record" and "duplicate voting record" of each registrant which, of course, indicate whether or not the

person voted at any election. Even the number of the ballot supplied to the voter appears thereon. These voting records at once disclose whether the registrant failed to vote at four successive general elections. (*Cf.* 19:31-4, 19:31-21).

Other points are argued by the Superintendent of Elections—(a) that the act of the clerk was a violation of the provisions of the Public Records Statute, *R. S.* 47:3-1; (b) that in any event the municipal clerk violated the law of the state by burning the poll books of 1936 and 1937. If any person believes that the clerk, by his act, has violated any law of this state, it is the duty of such person to make complaint to the proper authorities. Raising and arguing these questions in this proceeding cannot confer jurisdiction to consider them. The jurisdiction is bestowed by the statute under which this proceeding is had. It is limited and may not be exceeded. The petition presented by the superintendent recognizes this and the prayer is made in accordance with the amendment which is the law governing this proceeding. It authorizes the court to compel the production of the poll books in the "possession or custody" of the clerk—nothing more. An exposition of what constitutes a "poll book" and a "registry book," under the law, was necessary here, since it was considered by both sides to be the issue. Certainly the meaning of the terms involved should be settled. Such determination of meaning, although strictly speaking, *dicta*, should be helpful to all public officials in the state who have to do with elections.