QUESTIONS: 1. What period of time is to be considered the taxable year, for purposes of administering this levy of severance tax on minerals? 2. Can the unused portion of the moneys paid into the trust fund to the credit of the individual producer be carried forward to succeeding years, if a producer with an approved reclamation and restoration plan does not incur enough reclamation costs for any given year to receive the maximum refunds as provided for in s. 211.32(3)(d) 1. and 2., F.S.? 3. Can the excess expenses incurred by the producer be carried forward for possible refund in future years, if a producer has reclamation costs exceeding the maximum refund allowed for the taxes paid under this part? 4. At what point should the tax paid into the Land Reclamation Trust Fund be transferred to the General Revenue Fund, when the department has determined that the producer is not reclaiming land?
SUMMARY: The calendar year is the tax year for purposes of administering the severance tax on solid minerals because Part II of Ch. 211, F.S., discloses the intention of the legislature to base the tax and its administration on a calendar year basis. Unused portions of moneys paid into the Land Reclamation Trust Fund for which no reclamation credits or refunds are claimed may not be carried forward for use in making refunds in future tax years because the legislature has not provided for such accumulation of taxes and carry forward of reclamation credits from year to year. A taxpayer who has reclamation costs exceeding the maximum refund allowed may not carry forward excess reclamation costs for reclamation credits or refunds in future years because the legislature has not provided for such. The comptroller may not administratively allow a taxpayer to carry forward unclaimed amounts in the trust fund for use in making refunds in future years nor may the comptroller allow a taxpayer to carry forward excess reclamation costs for reclamation credits or refunds in future years because such authority has neither been expressly nor by necessary implication granted by the legislature. The Department of Revenue should transfer severance taxes paid into the Land Reclamation Trust Fund to the General Revenue Fund only after ascertaining from the comptroller the amounts thereof that are not being claimed by the taxpayers or refund claims that have been wholly or partially denied by the comptroller. Ordinarily, the Department of Revenue should make such determination and make such transfer within one year from and following the date of payment of the annual severance taxes (on or before April 1). Clarification of claims for refund for reclamation work is an area of appropriate legislative action in light of the policy of this state to protect and preserve the natural features of the environment. AS TO QUESTION 1: As to the tax year of the severance tax on solid minerals, s. 211.33(2), F. S., provides as follows: The department shall determine the value of solid minerals for the preceding taxable year by March 1. The tax imposed by this part shall be due on or before April 1 for the preceding taxable year and shall be paid at the same time the annual return is filed. . . . The return shall be filed on or before April 1 for the preceding taxable year . . . . (Emphasis supplied.) Section 211.31(1), F.S., levies the severance tax of 5 percent of the value of solid minerals severed and further provides: (2) The 5 percent rate provided in subsection (1) shall be suspended for a period of four years beginning July 1, 1971. It its place the following rates shall be applicable for the periods set forth: (a) July 1, 1971 through June 30, 1973 — 3 percent . . . . (b) July 1, 1973 through June 30, 1975 — 4 percent . . . . (Emphasis supplied.) Thus, the former statute speaks to a calendar tax year while the latter begins and maintains the tax rate on a fiscal tax year. These statutes are not in my opinion in conflict. The July 1 start-up date for the tax rate occurs because this is the effective date of the law imposing the severance tax (s. 5, Ch. 71-105, Laws of Florida). The fact that the legislature did not convert the tax rate to a calendar year when raising the rate is not determinative of the tax year. Rather, the legislature in s. 211.33(2), supra, has provided that the value of solid minerals is to be determined by the Department of Revenue for the preceding taxable year by March 1. Furthermore, the tax is due on or before April 1 for that preceding taxable year and the return is to be filed on or before April 1 for that tax year. It is therefore evident that the legislature intended the tax year to be the calendar year pursuant to the cited language of s. 211.33(2), supra. Cf. AGO 071-225. To view the statute otherwise would produce an impractical and unreasonable result. For example, if a fiscal year of May 1, 1972, through April 30, 1973, were allowed to be used by a taxpayer, the department could not determine the value of the minerals for the preceding taxable year until after April 30, 1973, but before March 1, 1974. The tax and the return would not be due until April 1, 1974, for a taxable year that had ended eleven months prior to that time. If the language of a statute is reasonably susceptible of two different interpretations, the statute should be interpreted in a manner that would avoid unreasonable, absurd, or ridiculous consequences. Curry v. Lehman, 47 So. 18 (Fla. 1908); Foley v. State,50 So.2d 179 (Fla. 1951); George v. State, 203 So.2d 173 (Fla. 1967); and Johnson v. Presbyterian Homes of the Synod of Florida, Inc.,239 So.2d 256 (Fla. 1970). Furthermore, s. 211.32(1), F.S., allows as a credit against severance taxes ad valorem taxes paid upon the separately assessed mineral interest of the property upon which qualified sites of severance are located, not to exceed 20 percent of the taxes due, if the taxpayer has an approved program for reclamation and restoration of the site of severance. Since ad valorem taxes accrue and are paid on an annual basis, this is further evidence in my opinion that the legislature intended the severance tax to apply to and be administered on a calendar year basis. Also, I bring to your attention the fiscal note, dated April 27, 1971, on the proposal for the severance tax on solid minerals (Ch. 71-105, Laws of Florida a/k/a Committee Substitute for HB 117), as prepared by the House Committee on Finance and Taxation. The fiscal note estimates the anticipated revenue of the severance tax on solid minerals and bases its estimate on a tax year of July 1, 1971, to January 1, 1972, for the first half year of operation and thereafter on an annual basis. Finally, had the legislature intended a fiscal year to be the tax year then surely it would have provided that the tax and return be due two or three months after the fiscal year as is the federal practice and that of most states. See I.R.C. s. 6072. Instead, the taxpayer and Department of Revenue are mandatorily locked into a due date of the tax and return of April 1 and have no authority to vary this. I therefore conclude that for purposes of administering the severance tax on solid minerals the period of time to be considered as the tax year is the calendar year. I reach this conclusion notwithstanding s. 211.01(2), F.S., which provides as follows: The word "annual" means the calendar year, or the taxpayer's fiscal year, when permission is obtained from the department to use a fiscal year as a tax period in lieu of a calendar year. The above-cited statute is in Part I of Ch. 211, F. S., which levies an excise tax on the production of oil and gas. Section 211.30 purports to incorporate said s. 211.01(2) into Part II of Ch. 211 as follows: In addition to the definitions contained in s. 211.01 of part I, the following works and terms shall have the definition and meaning ascribed to them in this section, unless the intention to give a more limited meaning is disclosed by the context: (Emphasis supplied.) The tax on production of oil and gas as levied by Part I of Ch. 211, F.S., is due and payable on or before the 25th day of the calendar month next succeeding the calendar month in which the tax accrued, and a report must be filed each month pursuant to s. 211.07(1) and (2). On the contrary, the severance tax on solid minerals as imposed by Part II of Ch. 211 is due and payable on an annual basis pursuant to s.211.33(2), and reclamation refunds are determined on an annual basis pursuant to s. 211.32(3)(e). Therefore, a more limited meaning of the word "annual" is in my opinion disclosed by the context of its use in Part II of Ch. 211. AS TO QUESTIONS 2 and 3: Your second question inquires if a producer with an approved reclamation and restoration plan does not incur enough reclamation costs for the given year to receive the maximum refunds as provided in s. 211.32(3)(d) 1. and 2., F.S., then can the unused portion of the moneys paid into the trust fund to the credit of the individual producer be carried forward to succeeding years. Your third question asks if reclamation costs in excess of the maximum refunds are incurred may the taxpayer carry forward such for refunds in succeeding years. Inasmuch as these questions are interrelated, I will discuss and answer them together. The relevant statutory provisions are as follows: There is hereby levied . . . an excise tax upon every person engaging in the business of severing solid minerals . . . . Such tax shall be 5 percent of the value at the point of severance . . . . The proceeds of the tax, excluding the amount credited for ad valorem tax payments, shall be paid into the state treasury as follows: (a) Fifty percent to the credit of the general revenue fund of the state; and (b) Fifty percent to the credit of a land reclamation trust fund to be established for refunds under the provisions of s. 211.32(3). Section 211.31(1), F.S. (1)(a) A taxpayer shall be entitled to a credit against the tax imposed by this part in an amount equal to the full amount of ad valorem taxes paid upon the separately assessed mineral interest of the real property upon which the site of severance is located. [Not to exceed] 20 percent of the taxes due under this part. (b) The amount of ad valorem taxes allowed for credit may be accumulated from year to year on property upon which a site of severance may be or is located. (c) A credit for payment of ad valorem taxes shall be allowed only if the taxpayer has a program for reclamation and restoration of the site of severance approved by, and filed with, the department of natural resources. Section 211.32(1)(a),(b), and (c), F.S. * * * * * (3)(a) A taxpayer shall be further entitled to a refund of taxes paid under this part by instituting a reclamation and restoration program upon the site of severance subject to the taxes imposed by this part . . . . * * * * * (b) The reclamation and restoration program may include qualified sites other than the site of severance upon which the taxes were paid . . . which must meet, at the minimum, the following qualifications: 1. The restoration or reclamation of the site and the program to be instituted is in the public interest; and 2. The location of the site is in an area where economic considerations would not be conducive to immediate restoration or reclamation of the site. (c) As an alternative to instituting a program of restoration and reclamation, the taxpayer may request the department [of natural resources] to accept the site as state land. . . . The refund under this election shall be computed on the fair market value of the land at the time of transfer . . . . (d) The comptroller shall, upon written verification of compliance with paragraphs (a), (b), or (c) of this subsection by the department of natural resources, and upon verification of the cost of the restoration and reclamation program or, if paragraph (c) is elected, the fair market value of the land, grant a partial refund, to be paid from the land reclamation trust fund, of the taxes paid under this part, as follows: 1. An amount equal to 100 percent of the cost in complying with paragraph (a) but not greater than 25 percent of the taxes paid under this part; and 2. An amount equal to 100 percent of the cost in complying with paragraph (b) but not greater than 25 percent of the taxes paid under this part; or 3. An amount equal to 100 percent of the fair market value of the land transferred in complying with paragraph (c) but not greater than 50 percent of the taxes paid under this part. (e) Upon determination by the department of the annual refund to which the taxpayer may have been entitled, the department shall determine that portion of taxes paid into the land reclamation trust fund for which reclamation credits are not being claimed and shall transfer the unclaimed portion thereof into the general revenue fund. (Emphasis supplied.) Section 211.32(3), F.S. Thus, pursuant to the above-quoted statutes, the proceeds of the severance tax (less amounts allowed as credits for ad valorem taxes paid by the taxpayer) are to be divided in half, with one-half of the proceeds going into the General Revenue Fund and the remaining onehalf going to a Land Reclamation Trust Fund established for partial refunds of the severance tax. Such refunds are available to those with an approved or qualified reclamation and restoration program. If unclaimed, they are to be transferred to the General Revenue Fund. From the Reclamation Trust Fund, a taxpayer may receive partial refunds of the severance tax paid for costs of reclamation work done at the site of severance but not to exceed 25 percent of the severance tax actually paid. At other qualified sites (other than the site of severance upon which taxes were paid), the taxpayer may likewise receive a partial refund of severance taxes paid but likewise not to exceed 25 percent of the taxes paid. In lieu of instituting a reclamation and restoration program and receiving the above refunds, a taxpayer may simply convey to the state sites at which the severance tax was imposed. This refund is computed on the fair market value of the property conveyed at the time of its transfer to the state but is not to be greater than 50 percent of the severance taxes paid. Finally, when the Department of Revenue makes its annual determination of the amount of severance taxes paid into the Land Reclamation Trust Fund for which no reclamation credits or costs are being claimed, or to which the taxpayers are not entitled to claim the partial refunds fixed by the statute, then it is to transfer the unclaimed portions of the tax paid into the trust fund into the General Revenue Fund. The following example may be helpful to illustrate the mechanics of the severance tax and the various refunds available to the taxpayer. HYPOTHETICAL NUMBER I, SITE A Assume that the total severance tax due by a person severing solid minerals was nine thousand dollars. The tax was imposed on the fair market value of minerals severed at the site of severance. Assume further that at the site of severance the taxpayer has instituted a reclamation and restoration program pursuant to criteria adopted by the department of natural resources and has incurred four thousand dollars in reclamation costs during the year at that site. Assume finally that the taxpayer paid one thousand dollars in ad valorem taxes upon the separately assessed mineral interest of the real property upon which the site of severance is located. The taxable consequences of the hypothetical situation are as follows: !mbr192!x
Gross severance tax due $ 9,000 Credit for ad valorem taxes paid $ 1,000 ___ (but not to exceed 20 percent of severance tax) $8,000 One-half to General Revenue Fund $ 4,000 One-half to Land Reclamation Trust Fund $ 4,000 Total Reclamation costs $ 4,000 Refund to taxpayer (reclamation costs $ 2,000 but not to exceed 25 percent of severance taxes paid) Section 211.32(3)(d)1., F.S. Transfer from trust fund to General $ 2,000 Revenue Fund ($4,000-$2,000) Section 211.32(3)(e), F.S.
!mer!x HYPOTHETICAL NUMBER II, SITE B Assume the same facts as Hypothetical Number I except assume also that the taxpayer is conducting reclamation and restoration work at a qualified site other than the site of severance and has incurred reclamation costs of one thousand dollars at this additional site. The taxable consequences of this hypothetical situation are as follows: !mbr264!x Gross severance tax due $ 9,000 Credit for ad valorem taxes paid $ 1,000 ___ (but not to exceed 20 percent of severance $8,000 tax) One-half to General Revenue Fund $ 4,000 One-half to Land Reclamation Trust Fund $ 4,000 Total Reclamation costs (Sites A B) $ 5,000 Refund to taxpayer for Site A $ 2,000 (reclamation costs but not to exceed 25 percent of tax paid) Section 211.32(3)(d)1., F.S. Refund to taxpayer for Site B $ 1,000 (reclamation costs but not to exceed 25 percent of tax paid) Section 211.32(3)(d)2., F.S. Total Refund $ 3,000 Transfer from Trust Fund to General $ 1,000 Revenue Fund ($4,00-$3,000) Section211.32(3)(e), F.S. !mer!x HYPOTHETICAL NUMBER III, SITE C Assume the same facts as Hypothetical Numbers I and II except assume also that the taxpayer conveys to the state land where severance of minerals has taken place, which land has a fair market value of twenty thousand dollars at the time of the transfer. The taxable consequences of Hypothetical Number III are as follows: !mbr184!x Gross severance tax due $ 9,000 Credit for ad valorem tax paid $ 1,000 ___ (but not to exceed 20 percent of severance $8,000 tax) One-half to General Revenue Fund $ 4,000 One-half to Land Reclamation Trust Fund $ 4,000 Fair market value of Site C $20,000 Refund to taxpayer (fair market value $ 4,000 of land transferred but not to exceed 50 percent of severance taxes paid) Section211.32(3)(d)3., F.S. Transfer from Trust Fund to General Revenue Fund !mer!x Thus, the General Revenue Fund ultimately receives at least onehalf of the net severance tax while the taxpayer receives in some circumstances a refund of up to one-half of the net severance tax. The taxpayer may never qualify for a full refund of severance taxes paid because of the limitations imposed on refunds by the aggregate percentage brackets of 50 percent in s. 211.32(3)(d) 1. and 2., supra, or the 50 percent percentage imposed by s. 211.32(3)(d) 3., supra, or inability or failure to meet the requirements of s. 211.32(3)(a), (b), or (c), supra. The taxpayer, at most, is limited to the maximum refund of 50 percent of the severance taxes paid in the year regardless of the fact that total costs of reclamation and restoration or the fair market value of any site transferred to the state far exceed the amount of the maximum partial refunds allowed by law. With the aforesaid explanation in mind I return to the questions at hand which are whether a taxpayer may carry forward unclaimed portions of the moneys paid into the trust fund if the taxpayer does not incur enough reclamation costs for any given year to receive the maximum refunds allowed by law, and may a taxpayer carry forward reclamation costs in excess of the allowable maximum partial refund for refunds in future years. Your inquiry describes the unused portion as "moneys paid into the trust fund to the credit of the individual producer." (Emphasis supplied.) These moneys should not be characterized as paid "to the credit of the individual producer." Rather, they are paid into the state treasury to the credit of the Land Reclamation Trust Fund pursuant to s. 211.31(1)(b), F.S., where they are in turn held, pursuant to s. 211.32(3), F.S., for purposes of partial refunds to certain taxpayers in certain circumstances and for any unclaimed tax money to be transferred to the General Revenue Fund. Once the Department of Revenue receives the severance taxes by April 1 (excluding amounts credited for ad valorem tax payments), it is to immediately deposit same into the state treasury with one-half to the credit of the General Revenue Fund and one-half to the credit of the Land Reclamation Trust Fund pursuant to s. 211.31(1), supra. The use of a trust fund to maintain the severance taxes that may be claimed for a refund is not an uncommon practice in state fiscal control of specialized funds: (1) All moneys received by the state shall be deposited in the state treasury . . . and shall be deposited in and accounted for . . . within the following funds, which funds are hereby created and established: (a) General revenue fund, (b) Trust funds, * * * * * (2) The source and use of each of the aforesaid funds shall be as follows: * * * * * (b)1. The trust funds shall consist of moneys received by the state which under law or under trust agreement are segregated for a purpose authorized by law. . . . Section 215.32, F.S. After the department has accepted the return of the taxpayer as true and correct and deposited the appropriate amounts in the General Revenue Fund and Land Reclamation Trust Fund, its direct duties regarding refunds of severance taxes for reclamation work cease. Instead, s. 211.32(3)(d), supra, imposes upon the comptroller the duty to grant partial refunds of severance taxes paid for the cost of eligible reclamation and restoration work only upon the written verification by the Department of Natural Resources to the comptroller that the taxpayer has met the requirements of a qualified and suitable reclamation and restoration program under s. 211.32(3)(a),(b), or (c), supra, and only upon verification by the comptroller of the costs of the reclamation program or fair market value of land if such is transferred to the state. Meanwhile, the moneys paid into the trust fund remain there until such time as the comptroller has acted upon the claims for refund or has noted that there are no claims for refund. Cf., s.211.06(2), F.S., as incorporated into Part II of Ch. 211 by s.211.33(1), F.S., wherein the Department of Revenue is authorized to formulate settlements and refunds and the comptroller is authorized to make payments thereon upon proper application and proof, if he deems it necessary, of severance taxes paid in cases of overpayment of the tax, payment when no tax is due, or erroneous payment of the tax. This statute is, of course, inapplicable to claims for refunds as provided by s. 211.32(3)(d), supra, since the latter are claims for refunds of severance taxes for reclamation costs or transfers of land to the state for which the severance tax was properly imposed and paid. Consequently, the reclamation refunds are not refunds of severance taxes paid in error, overpayments, or payments of tax when none are due. The grant to the comptroller of the power to grant partial refunds of severance taxes paid from the trust fund is consistent with the comptroller's constitutional and statutory duties regarding the refund of moneys paid into the state treasury: (d) The comptroller shall serve as the chief fiscal officer of the state, and shall settle and approve accounts against the state. (e) The treasurer shall keep all state funds and securities. He shall disburse state funds only upon the order of the comptroller, countersigned by the governor. . . . (Emphasis supplied.) Article IV, s. 4, State Const. Section 17.03(1), F.S., states: (1) The comptroller of this state shall examine, audit, and settle all accounts, claims and demands, whatsoever, against the state, arising under any law or resolution of the legislature, and issue his warrant to the treasurer directing him to pay out of the state treasury such amount as shall be allowed by said comptroller thereon. It is held that the comptroller, before issuing any warrant for payment of an account against the state, has the duty to make an administrative determination that the money is in the state treasury, that an appropriation has been made by law to pay the account, and that the expenditure is within the law fixing the powers of the state agency incurring the obligation. Florida Development Commission v. Dickinson, 229 So.2d 6 (1 D.C.A. Fla., 1969), cert. denied,237 So.2d 530 (Fla. 1970). In Advisory Opinion to the Governor,200 So.2d 534 (Fla. 1967), and Advisory Opinion to the Governor,201 So.2d 226 (Fla. 1967), the court noted that under ss. 215.31 and215.32, F.S., and the State Constitution, legislative appropriation or authorization is necessary for the use of any funds from whatever source by a public agency or public official and trust funds in the state treasury cannot be disbursed except pursuant to specific legislative authority for a specific use or purpose authorized by law. See also, AGO 074-37 to like effect. The principle of law enunciated in 200 So.2d 534 and 201 So.2d 226
applies equally to the instant Land Reclamation Trust Fund. Thus, it is the comptroller's duty and power to ascertain that any proposed refund is authorized by law, Florida Development Commission, supra, and AGO's 060-72 and 062-72, and to grant payments from trust funds only when specifically authorized by statute for a specific purpose or use. Advisory Opinions, supra, and AGO 074-37. In short, in the case at hand, the Department of Revenue is granted the authority to collect, enforce, and administer the severance tax pursuant to s. 211.33, F.S. However, the comptroller is granted, pursuant to s. 211.32(3)(d), supra, and pursuant to his constitutional and statutory duties discussed above, the authority to grant partial refunds of the severance tax upon his verification that the taxpayer meets the requirements of an approved and suitable reclamation and restoration program and the costs of same as outlined in s. 211.32(3). Your question therefore becomes whether Part II of Ch. 211, F.S., allows a taxpayer to carry forward credits for refunds or unclaimed portions of the severance tax paid into the trust fund, or carry forward excess reclamation costs and, if not, whether the comptroller is granted the authority to allow the taxpayer to so carry forward such credits for refunds and excess reclamation costs. Chapter 211, F.S., grants no express or specific authority to a taxpayer (or to the comptroller) to accumulate and carry forward unclaimed refunds or excess reclamation costs. There is specific statutory authority in s. 211.32(1)(b) allowing ad valorem taxes paid upon the separately assessed mineral interest of the property upon which the site of severance is located to be accumulated from year to year and credited against severance taxes paid, if the taxpayer has an approved program for reclamation and restoration of the site of severance. These credits are, of course, carried forward for use as credits in future years, but in no event shall such credits exceed 20 percent of severance taxes due. The legislature in specifically providing for the accumulation of the amount of such taxes allowed for credit from year to year and allowing their use as credits against the severance tax in later years is deemed to have excluded all other forms of accumulated credits or taxes unless specifically mentioned pursuant to the rule of statutory construction expressio unius est exclusio alterius. This means that a statute enumerating things upon which it is to operate or forbidding certain things must be construed as excluding from its operation all things not expressly mentioned. Ideal Farms Drainage Dist. v. Certain Lands,19 So.2d 234 (Fla. 1944), and O'Brian Associates of Orlando, Inc. v. Tully, 184 So.2d 202 (4 D.C.A. Fla., 1966). I apprehend that, had the legislature intended to establish and provide for the accumulation and carry forward of credits for refunds or excess reclamation costs to future tax years, it would have been a simple thing for the legislature to have so provided and it would have done so clearly and unequivocally as it did for the ad valorem tax credit. Dobbs v. Sea Isle Hotel, 56 So.2d 341 (Fla. 1952). Indeed, the legislature imposed a similar type limitation or ceiling on both the ad valorem tax credit and the reclamation refund. Yet in the first instance of the ad valorem tax credit the legislature saw fit to specifically provide for the accumulation of that credit yet did not for reclamation refunds, notwithstanding the even more mandatory and generous terms which grant the ad valorem tax credit for the "full amount of ad valorem taxes paid" in s.211.32(1)(a). The legislature, I conclude, has therefore excluded an accumulation and carry forward of unused portions of severance taxes paid for which refunds may have been claimed or a carry forward of excess reclamation costs. In any event, as hereinafter discussed, if the statute does not expressly or by necessary implication grant a public agency or official the power to allow such unclaimed refunds or excess reclamation costs to be accumulated and carried forward to future years, no authority at law exists for the public agency or official to allow the taxpayer to carry forward such credits for refunds of taxes paid in future years or to disburse moneys from the state treasury for such unauthorized purposes. I note, while taxing statutes are always construed liberally in favor of the taxpayer and against the taxing officials, nevertheless exemptions and special benefits to particular taxpayers that remove them from the more burdensome requirements applicable to others are construed strictly against the exemption. State v. Thompson, 101 So.2d 381 (Fla. 1958); Lake Garfield Nurseries Company v. White, 149 So.2d 576 (2 D.C.A. Fla., 1963). Furthermore, the recovery or refund of taxes paid is solely a matter of legislative grace. State v. Gay, 74 So.2d 560 (Fla. 1954). Statutes authorizing a refund of taxes are to be strictly construed against the person seeking the refund and in favor of the refunding authorities. People ex rel. Herlihy Mid- Continent Co. v. Nudelman, 18 N.E.2d 225, 227 (Ill. 1938); Asmer v. Livingston, 82 S.E.2d 465, 466 (S.C. 1954); 82 C.J.S. Statutes s. 396(d), p. 958; 84 C.J.S. Taxation s. 632, p. 1266; and AGO 059-226. By the rule of strict construction . . . is not meant that the statute shall be stintingly or even narrowly construed, but it means that everything shall be excluded from its operation which does not clearly come within the scope of the language used. (Emphasis supplied.) Sutherland Statutory Construction, s. 58.02, p. 464 (1973). I also bring to your attention the general rule that if a statute is ambiguous or there is doubt as to its meaning, then reference to its heading or title may be made if furnished by the legislature. Berger v. Jackson, 23 So.2d 265
(Fla. 1945), and AGO 057-314. See also, Board of Public Instruction v. State ex rel. Allen, 219 So.2d 430 (Fla. 1969); County of Hillsborough v. Price, 149 So.2d 912 (2 D.C.A. Fla., 1963); and Askew v. MGIC Development Corporation of Florida,262 So.2d 227 (4 D.C.A. Fla., 1972). The title to the severance tax on solid minerals, Part II, Ch. 211, F.S., was enacted by the legislature and provides as follows: AN ACT relating to taxation; imposing an excise tax on the severance of solid minerals; providing the rate, basis and distribution of tax; providing for credits and refunds; providing for certain exclusions; providing a land reclamation trust fund; providing for administration, penalties and procedures; amending section 193.481, Florida Statutes, to provide for separate assessment of minerals; providing reduced rate for implementation period; providing a severability clause; providing an effective date. (Emphasis supplied.) Chapter 71-105, Laws of Florida. The aforesaid title indicates that the act is related to taxation and provides "credits and refunds" and a "land reclamation trust fund." It does not include as its objective the restoration and reclamation of land when solid minerals are severed. Nor does it provide for or mention any accumulation and carry forward of reclamation refunds or excess reclamation costs. There is no intent expressed in the title or the act itself favoring the maximum reclamation of land or that the act be liberally construed to promote reclamation. Indeed, as noted previously, the maximum refund, in certain circumstances, a taxpayer is allowed each year pursuant to the statute is 50 percent of severance taxes paid no matter how much reclamation work is being done. Courts cannot attribute to the legislature an intent which is not in any way expressed in the statute. [See] 82 C.J.S. Statutes s. 322, p. 576, and Bill Smith, Inc. v. Cox, 166 So.2d 497 (Fla. 1964). A strained construction of a statute cannot be adopted in order to give effect to what a court may think is the unexpressed intention of the legislature. Application of Superintendent of Elections in Hudson County,15 A.2d 813 (N.J. 1940), and Ervin v. Capital Weekly Post,97 So.2d 464 (Fla. 1957). This is so because a legislative intention not expressed in some appropriate manner has no legal existence. State ex rel. Gebhardt v. Superior Court for King County, 131 P.2d 943
(Wash. 1942). Furthermore, the intention is gathered from what the legislature actually said, and not from what it may have intended to but did not say. Reynolds Metal Co. v. Glass, 195 S.W.2d 280
(Ky. 1946). I therefore conclude for the above reasons that your second and third questions must be answered in the negative in that a taxpayer with an approved reclamation plan who does not incur enough reclamation costs for any given year to receive the maximum refund of severance taxes may not accumulate and carry forward to succeeding tax years the unused refunds or portions of severance taxes paid into the trust fund, and likewise a taxpayer who incurs reclamation costs in excess of that allowed as a refund for the current year may not carry forward such for refunds in later years. This conclusion is consistent with federal tax law whereby deductions including losses are determined solely by the terms of the tax statute and do not arise by implication or in the absence of specific authorization. They are allowed only when granted by clear statutory language or when plainly authorized. [See] 85 C.J.S. Taxation s. 1099, pp. 772 and 786. This principle is applied to carry-backs and carry-forwards accruing to taxpayers so that they are not allowed unless specifically authorized by law. See Keystone Table Company, 1 B.T.A. 382 (1925); Empire Builders Supply Co. Inc. v. Commissioner of Internal Revenue,16 B.T.A. 1085 (1929); and Reuben L. Anderson-Cherne, Inc. v. Hatfield, 158 N.W.2d 840 (Minn. 1967). Cf., Riss Company, Inc. v. Commissioner of Internal Revenue, 45 T.C. 230 (1965); Newton v. Commissioner of Internal Revenue, 57 T.C. 245 (1971); and Messina v. U.S. 32 AFTR 2d 73-5188 (U.S.Ct.Cl. 1973). I likewise conclude that the comptroller may not administratively allow the accumulation and carry forward of these funds or the carry forward of excess reclamation costs. I find no specific grant of such authority nor is any such authority necessarily implied from the power to the comptroller to grant refunds. If a particular power is not expressly conferred or cannot be fairly implied from powers expressly conferred, then it should not be exercised. State v. Fowler, 105 So. 733 (Fla. 1925), and City of Pensacola v. Fillingim, 46 So.2d 876 (Fla. 1950). If there is a reasonable doubt as to the lawful existence of a power that is or may be exercised by an administrative agency, then the exercise of that power should be arrested. Such doubt is resolved against the exercise of the power. Edgerton v. International Company,89 So.2d 488 (Fla. 1956); and City of Cape Coral v. GAC Utilities, Inc. of Fla., 281 So.2d 493 (Fla. 1973). Clarification of claims for refund of severance taxes would of course be an appropriate subject for legislative action to implement the strong public policy of this state expressed elsewhere to both preserve and protect the natural features of the environment. See generally s. 258.17-258.33, 380.012-380.10, F.S., and Ch. 253, F.S. AS TO QUESTION 4: Your fourth question asks at what time should the Department of Revenue transfer to the General Revenue Fund severance taxes paid
into the trust fund for which the taxpayer is not claiming refunds for reclamation costs or credits. Section 211.32(3)(e), F.S., provides: Upon determination by the department of the annual refund to which the taxpayer may have been entitled, the department shall determine that portion of taxes paid into the land reclamation trust fund for which reclamation credits are not being claimed and shall transfer the unclaimed portion thereof into the general revenue fund. (Emphasis supplied.) Thus the Department of Revenue is to transfer the unclaimed portions of the trust fund to the General Revenue Fund when the department determines the annual refund to which the taxpayer may have been entitled but is not claiming. The precise time for this determination is not further specified in the statute. However, in practice the department can make this determination only by conferring with the comptroller to ascertain from the comptroller whether the taxpayer is or is not instituting a reclamation program; is or is not claiming a refund for such work; is claiming a refund for reclamation costs less than the maximum allowed; or whether the taxpayer's claim for refund has been wholly or partially denied by the comptroller. Upon the Department of Revenue receiving such information from the comptroller, then at that time the department is to transfer the unclaimed portions of the trust fund to the General Revenue Fund. The frequency of such ascertainment by the Department of Revenue is likewise not specified by the statute. In any event unless indicated otherwise by statute, mandatory words specifying the time within which duties of public officers are to be performed may be construed as directory only. Lomelo v. Mayo, 204 So.2d 550 (1 D.C.A. Fla., 1967), and Apgar v. Wilkinson, 116 So. 78 (Fla. 1928). The department, however, should not exceed a year from the date of payment of the tax in making such determination. The severance tax is an annual tax pursuant to s. 211.33(2), supra, and as discussed in the answer to question 1, and the refund is computed on an annual basis pursuant to s. 211.32(3)(d) and (e), supra. Therefore, the department should make its determination of the refund which the taxpayer may be entitled to, as well as that portion of taxes paid into the trust fund for which reclamation credits are not being claimed, within a year from and following the time the annual severance taxes are paid (on or before April 1 of each year for the preceding tax year). Furthermore, there is no requirement in the law to wait until a period of nonclaim or statute of limitation expires before transferring such funds. It is entirely logical that the Department of Revenue should transfer after the end of the tax year and after conferring with the comptroller amounts in the trust fund paid by a taxpayer which for such year the taxpayer has no reclamation plan, has a plan but incurs no reclamation costs, or has a plan but incurs costs less than the maximum allowed. For the exceptional case in which a taxpayer has a reclamation plan, incurs reclamation costs, but makes no claim for refund until just before a period of nonclaim expires, the comptroller would simply pay the refund claim to the taxpayer, if appropriate, from funds paid into the trust fund by other producers in that particular tax year. At the end of that tax year the department would have less to transfer to the General Revenue Fund but the moneys would be available in the trust fund to cover such refunds. In short, the trust fund is a continuing fund established for refunds with ample provisions to insure that moneys are paid into it from year to year for which refunds may be claimed.
If the comptroller should be unable to verify the amount of the trust funds not being claimed in any given year due to the fact that his auditing and verification duties under the constitution and statutes may not have been completed within a year from the date of payment of the severance tax by the taxpayer, the Department of Revenue necessarily must delay the transfer of the affected trust funds to the General Revenue Fund until such time as the comptroller has completed the required auditing and verification functions. Until such time, the moneys in the trust fund remain intact and subject to the claims for reclamation refunds or credits provided for by s. 211.32(3), F.S.