18 N.J. Super. 286 (1951)
86 A.2d 798
PUBLIX ASBURY CORP., INC., A CORPORATION, PLAINTIFF,
v.
CITY OF ASBURY PARK, N.J., ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided August 21, 1951.
*290 Mr. Harry Green, attorney for the plaintiff.
Mr. Abraham Frankel, City Attorney, for defendant, City of Asbury Park, N.J.
LEONARD, J.C.C.
The plaintiff and defendants have stipulated that the complaint and supplemental complaint and the second count of the counterclaim of the defendant, City of Asbury Park, N.J., shall be dismissed without prejudice and without costs, and that this action shall proceed only as to the first count of said defendant's counterclaim.
By lease dated August 21, 1942, the defendant, City of Asbury Park, N.J., leased the Paramount Theatre, on the boardwalk, in said city, to one Walter Reade, an assignee of the plaintiff, for a term of 20 years. Said lease provided for the payment of an annual rent based upon certain percentages of all gross receipts, with a minimum guarantee of $12,500 per year "for the duration of the war," and thereafter $20,000 per year for the balance of the leasehold.
The pertinent portion of said lease reads as follows:
"For the term of twenty years to commence on the twenty-first day of August, 1942, at an annual rental of fifteen percent (15%) of all gross receipts up to $200,000.00 and seventeen and one-half percent (17 1/2%) of all gross receipts if same amounts to $200,000.00 and over with a minimum guarantee of $12,500.00 per year for the duration of the war (italics mine) and thereafter $20,000.00 for the balance of the leasehold, payable monthly."
It has been stipulated that the plaintiff, based upon the percentages contained in said lease, paid as rent from August, 1942, to the year of 1949, a sum in excess of $20,000 annually, but for the year of 1950 paid the sum of only $15,405.87.
The defendant, City of Asbury Park, N.J., in this counterclaim seeks to recover the difference between said $20,000 and the sum so paid for the year 1950, to wit, the sum of $4,594.13.
*291 The plaintiff denies that it is so indebted, and contends that the words "for the duration of the war," should be construed to mean until the war has been formally terminated by the making of a treaty or treaties of peace between the United States and its enemies, Germany, Italy, Japan, and their allies.
To the contrary, the defendant denies the construction contended by the plaintiff and bases its claim upon the contention that the words "for the duration of the war," as used in said lease, means the "shooting war," and that said "shooting war" terminated on or about September 2, 1945, when the actual fighting and hostilities ceased between the United States and its enemies as above referred to.
In support of its contention the plaintiff first relies upon R.S. 1:1-2A, which became effective May 2, 1942, some three months before the execution of said lease.
Said statute provides as follows:
"Unless it be otherwise expressly provided or there is something in the subject or context repugnant to such construction, the following words, phrases and clauses, namely: `present war,' `present war emergency,' `the existing state of war,' `present defense emergency,' when used or named within this State in any manner whatsoever with relation to a period of time shall mean so long as the United States of America continues in the present wars with the governments of Japan, Germany and Italy, or any of them, and until the making of a treaty or treaties of peace concluding all of said wars."
Plaintiff argues that said statute is applicable and controls the construction of the words in said lease.
The defendant argues that said statute has no application to this lease; that said statute was passed for the purpose of being an aid in the interpretation of statutes and legislation of this State. In support of this the defendant argues that said statute is annotated under section 1:1-2 in the Revised Statutes, which section of said Revised Statutes deals with definitions of words and phrases when used in any statute and in the Revised Statutes. Defendant further argues that the statement annexed to the original legislative bill (Assembly *292 Bill No. 143, year of 1942), which upon its passage became the statute involved herein, provided: "The passage of this Bill will save time and difficulty in drafting legislation."
Thus, the primary question to be determined is: Does said statute, to wit, R.S. 1:1-2A, control in the instant case?
The fundamental rule of judicial construction of statutes is to ascertain and give effect to the intention of the Legislature as expressed in the statute. Cooper v. State Board, 114 N.J.L. 10, 15 (Sup. Ct. 1934), affirmed 115 N.J.L. 115 (E. & A. 1935); Blackman v. Iles, 4 N.J. 82, 89 (1950).
A reading of the instant statute discloses that it states in part: "The following words, phrases and clauses, namely: `present war,' `present war emergency,' `the existing state of war,' `present defense emergency,' when used or named * * * shall mean * * *." (Italics mine.)
The lease in question uses the words or phrase "for the duration of the war."
Thus it will be noted that the statute does not include the specific words or phrase contained in said lease. To construe the statute to include the words or phrase in the lease would necessitate a construction that added to such statute either the specific words or phrase used in the lease, or in the alternative the following words or phrase, to wit: "or any other similar words, phrases and clauses."
In determining whether this should be done, the following basic rules of statutory construction as heretofore determined by our courts, are pertinent:
"It is elementary that the intent of the Legislature is to be gleaned from the language of the statute and that courts cannot arbitrarily expand the scope of a statute beyond the plainly expressed legislative intent." Eckert v. New Jersey State Highway Dept., 1 N.J. 474 (1949); Leeds v. Atlantic City, 13 N.J. Misc. 868 (Circ. Ct. 1935); Belfer v. Borella, 6 N.J. Super. 557 (Law Div. 1949), affirmed 9 N.J. Super. 287 (App. Div. 1950).
"The Legislature is deemed to mean what was plainly expressed. An unexpressed legislative intention is ineffective and unenforceable." Burnson v. Evans, 137 N.J.L. 511 (Sup. Ct. 1948).
*293 "The language under consideration does not require construction since it is not of doubtful meaning. A strained construction cannot be adopted in order to give effect to what a court may think is the unexpressed intention of the Legislature." In re Hudson Co. Elections, 125 N.J.L. 246, 254 (Sup. Ct. 1940); Hoboken v. State Board of Tax Appeals, 127 N.J.L. 179 (Sup. Ct. 1941); Board of Health, Plainfield, v. Charles Simkin Sons, Inc., 10 N.J. Super. 301 (Cty. Ct. 1950).
"Casus omissus can in no case be supplied by a court of law, for that would constitute the exercise of the law making power. Statutes should be interpreted according to the most natural and obvious import of the language, without resorting to subtle or forced construction for the purpose either of limiting or extending their operation. Courts cannot correct supposed errors or omissions of the Legislature." (Italics mine.) City Affairs, etc., Jersey City v. Department of Taxation 134 N.J.L. 198, 203 (Sup. Ct. 1946); Singer Sewing & Co. v. N.J. Unemployment Compensation, etc., 128 N.J.L. 611 (Sup. Ct. 1942).
"The courts will never lightly incorporate into a legislative enactment a meaning not expressed therein; it would be justified in doing so by the compulsion of a necessary implication." Taylor v. Rector, etc., Christ Church, 118 N.J. Eq. 288 (E. & A. 1935).
"To interpolate the desired words into the section would amount to the introduction of an entirely supplementary thought. The courts of our State are not clothed with the power to supervise legislation and the power to construe does not embrace the power to legislate. Courts have, of course, supplied apparent omissions in statutes. In such instances, the intent and the evident will were apparent and were utterly defeated by the omission. The general rule is that where words have been omitted from a statute by inadvertence or through clerical error, and the intent of the Legislature is clearly ascertainable from the context, the court will insert the words necessary to carry out that manifest intent. * * * In the construction of statutes, words should never be supplied except to effectuate a meaning clearly shown by the other part of the statute and to undertake to augment the substance of a statute as here desired would be an abortive act of legislation rather than a proper exercise of the power of judicial construction." Saslow v. Previti, 17 N.J. Misc. 29 (Cir. Ct. 1939); Crvil v. Woodeliff, 61 N.J.L. 107 (Sup. Ct. 1897); 3 A.L.R. 411.
In accordance with the above rules I do hereby determine that the specific statute involved herein cannot be construed to include the words contained in the lease in issue. The language of said statute is clear, unambiguous, plainly expressed, and is not of doubtful meaning. It *294 clearly limits itself to the following words, phrases and clauses, namely: "present war," "present war emergency," "the existing state of war," "present defense emergency." It does not contain the words or phrase used in the lease, to wit, "for the duration of the war," nor does it contain any reference to "similar words, phrases and clauses." I cannot adopt a strained construction to give effect to an alleged unexpressed intention of the Legislature. The context of said statute does not reveal any justification or the compulsion of any necessary implication that it should be enlarged or that any alleged omitted words supplied. To the contrary, the unmistakable intent as disclosed by the clear language is to limit its application to the specific clauses. The language used, to wit, "the following words, phrases and clauses, namely: `present war,' `present war emergency,' `the existing state of war,' `present defense emergency'" (italics mine), clearly warrant this construction. The word "namely" has been defined in Webster's New International Dictionary to mean "by name," "by particular mention," "specific," "especially," "expressly," "that is to say," "to wit." Manifestly, if the Legislature intended to expand this statute nothing was easier than for it to say so. For me to attempt to enlarge the scope of the same would constitute the exercise of a legislative function. This I will not do.
I, therefore, determine that the words used in said statute do not include the words used in the lease involved herein, and consequently the statute does not control the interpretation of the words and phrase used in said lease.
This conclusion does not require that I determine whether or not said statute was intended to control only statutes in this State, nor, as contended by the plaintiff, also private agreements. However, in passing, if I were called upon to make such a determination I would be constrained to do so without reference to the statement annexed to the original Assembly Bill, or without reference to the location of said statute in the Revised Statutes or its place in annotation. Neither of these extrinsic aids may be used to determine *295 the intention of the Legislature. Flagg v. Johansen, 124 N.J.L. 456 (Sup. Ct. 1940); R.S. 1:1-5.
Having determined that the above statute does not control, it becomes necessary to construe the words "for the duration of the war" as used in said lease.
The defendant counterclaimant and the plaintiff respectively contend a similar construction, as hereinbefore stated.
The cardinal rule in construing a contract is to ascertain and give effect to the mutual intention of the parties. Moses v. Ellis, 4 N.J. 315 (Sup. Ct. 1950). Likewise, it has been firmly established that if more than one construction of the language used is possible, the circumstances surrounding the transaction may be considered as well as the written document. Basic Iron Ore Co. v. Dahlke, 103 N.J.L. 635 (E. & A. 1927). In other words, where the construction is doubtful the court may look into surrounding circumstances and avail itself of such light as they may afford, in ascertaining the true meaning of the language and the terms employed. Fletcher v. Interstate Chemical Co., 94 N.J.L. 332 (Sup. Ct. 1920).
In the instant case certain evidence as to the circumstances surrounding the execution of the instant lease was stipulated, to save time and trouble of formal proof. However, said stipulation was qualified by the plaintiff's objection to the admission of the same into evidence on the ground that it would vary the terms of said lease. I allowed the introduction of said stipulated evidence over the objection of the plaintiff.
It is a settled rule that parol evidence is admissible to explain any ambiguity in a written instrument. Central Hanover & Trust v. Herbert, 1 N.J. 426 (1949). Generally, a written contract containing the whole agreement of the parties may not be altered by parol evidence, but an exception is that when the language of the contract is ambiguous or otherwise doubtful, the parol evidence is admissible not to contradict, alter or vary the terms of the written agreement, *296 but to explain the real intent of the parties. Speirs v. Spanko, 7 N.J. Super. 421 (Law Div. 1950).
A case of interest is the case of Hoover v. Sandifur, 171 P.2d 1009, 168 A.L.R. 170 (Wash. Sup. Ct. 1946). In that case the court said:
"Extrinsic evidence is admissible to show what the parties intended by the terms `duration' and `end of the war,' in a provision in a written contract for the sale of a business, reserving to the seller an option to repurchase within six months `after the duration,' or six months after the seller's subsequent discharge from the armed forces or within three years `after the duration of the war,' and that should the seller be discharged from the armed forces `prior to the end of the war' the option should not be in effect during the duration except by written agreement of the parties.
When the terms of a contract are susceptible of two interpretations an ambiguity is presented which makes a cardinal exception to the parol evidence rule."
The specific words or phrase involved herein in the instant lease are certainly subject to two possible constructions. This makes the meaning doubtful and ambiguous. Under the circumstances I affirm my previous ruling made during the trial and hold the evidence to be admissible.
That stipulated evidence discloses the following: The instant lease in question was executed on August 21, 1942. At that time the actual hostilities, that is, the "shooting war," was still in existence. In the City of Asbury Park, as in many other seashore and non-seashore cities, there were being rigidly enforced certain emergent regulations and conditions. The city was subject to dim-outs from May 16, 1942, to November 1, 1943. The boardwalk, where the theatre in question was located, was patrolled by civilian defense members and police reserves from January, 1942, to September, 1945. Members of the United States Army and Coast Guards were patrolling sections of said boardwalk. No civilians were permitted on the beach after sunset. On July 15, 1942, the city installed a 12-foot dim-out curtain along the beach and on the boardwalk, which remained during the summers of 1942, 1943, and 1944. Automobile gas *297 rationing was in effect. The city offered to convert from oil to gas for city heat, which heat was furnished to the theatre premises in question. In September, 1942, the United States Army took over the City Convention Hall, and other municipal buildings and installations. The same were used by it up until Christmas of 1945. In October of 1942, two of the largest privately owned hotels in the city which immediately adjoined the beachfront, were exclusively taken over by the British Navy, and they were barricaded and walled.
The acting city manager, Mr. Armstrong, and a member of city council, Mr. Smock, both testified as to a conference or conferences held by the city officials with Mr. Walter Reade, of the plaintiff corporation, prior to the execution of said lease. They both testified that at said conferences the existing emergent conditions were discussed, and that Mr. Reade discussed with the city officials the question of the minimum guarantee. They stated that Mr. Reade suggested that the desired minimum guarantee was high in view of said existing conditions, and that by reason of these conditions it might even be necessary to close the theatre. They further stated that Mr. Reade spoke of a higher minimum guarantee when the "restrictions were lifted," when "normal conditions returned." This testimony stands uncontradicted.
It is clear from the above stipulated evidence and uncontradicted testimony that the parties to said lease intended the words and phrase "for the duration of the war" to mean the end of the actual hostilities, that is, the shooting war, and the resultant lifting of the then existent emergent restrictions and conditions. Those were what made the operation of the particular moving picture theatre perilous and the higher minimum guarantee hazardous from a business viewpoint. Certainly, the actual making of peace treaties could not in anywise, in my humble judgment, affect that business one way or the other.
The logic of the case of Schaffer v. Oldak, 12 N.J. Super. 80 (Ch. Div. 1951), seems dispositive of this issue. In that case Judge Stein in construing the words and phrase "for *298 the duration of the present war," as used by a testator in his will, said:
"The testator, when speaking of the duration of the war or of its expiration, contemplated the cessation of hostilities and not what is generally a much later event  the signing of a formal treaty of peace. * * * The testator was not thinking in terms of diplomatic procedure which calls for a formal peace treaty. The latter event might be postponed for many years following the actual fighting, as has turned out to be the historical fact in relation to World War II. Final treaties have not yet been concluded and, if the hopes and prayers of the democratic world should be disappointed, World War III may ensue while technically World War II remains formally unclosed. Only the patience and forbearance of the free nations have thus far preserved the peace of the world. The almost universal use of the phrase `preserve the peace' is indicative of the popular concept of the time when a war ends. In common parlance a war ends when the shooting stops. The law is settled here and in other jurisdictions that it will be presumed that words used in a will are used in their usual and popular meaning, unless it is clear from the context that a narrow or technical meaning is intended. (Cases cited.) In Darnell v. Day, 37 N.W.2d 277 (Sup. Ct. Iowa 1949), the court held that only in matters which concern the public is the existence of war determined politically, but otherwise in matters involving purely private rights and relations. There a lessor undertook to make certain physical improvements one year after the end of the war. The court held that that meant one year after hostilities ceased and said:
"There is little doubt the parties here intended the words "after the war has ended" to mean after hostilities have ceased. War, in the practical and realistic sense in which it is commonly used, refers to the period of hostilities and not to a technical state of war which may exist after the fighting has ended. * * * The parties did not contract in terms of diplomatic parlance.'
In other cases involving leases, courts similarly construed phrases such as `duration of the war' and `end of the war.' See Lincoln v. Harvey, 191 S.W.2d 764 (Ct. Civ. App. Texas 1945), and Di Lello v. Carozza, 188 N.Y. Misc. 819, 70 N.Y.S.2d 256 (Sup. Ct. App. Term 1947)." (Italics mine.)
Judge Stein therein, distinguished that case from the case of Feil v. Senisi, 7 N.J. Super. 517 (Law Div. 1950), relied upon herein by the plaintiff, and he said:
"While that case involved private rights, nonetheless it called for a definition of a statutory phrase used in connection with military *299 service, itself a matter which directly touched the public interest. The distinction that I draw in the instant case is that the words here construed are considered differently when used in private documents, such as agreements or wills, than when used in public documents, such as statutes, treaties and the like." (Italics mine.)
Plaintiff herein also relies upon the case of Ludecke v. Watkins, 335 U.S. 160, 92 L.Ed. 1881 (1948). A reading of that case disclosed it dealt with the power of the President to deport an alien under the Alien Enemy Act, and it was determined therein that in the construction of said Act the words or phrase "state of war" should be made upon a public or political basis. The case is, therefore, not applicable to the situation at bar.
Plaintiff further argues that since the defendant is a municipality that the lease in question is a public document and not a private agreement and, therefore, the political construction of the particular words and phrase involved should be followed. The mere fact that one of the parties to a lease is a municipality does not make said lease a public document.
A municipality has two classes of powers:
(1) Legislative and governmental, by virtue of which it exercises a governmental and police power and controls its people.
(2) Proprietary and business, by which it acts and contracts for private advantages of itself and its inhabitants.
"In the exercise of the proprietary and business powers, the municipality is governed by the same rules as control an individual or business corporation under like circumstances." Reid Development v. Parsippany-Troy Hills Township, 14 N.J. Super. 142 (Law Div. 1951); Lehigh Valley R.R. Co. v. Jersey City, 103 N.J.L. 574 (Sup. Ct. 1927), affirmed 104 N.J.L. 437 (E. & A. 1928). See also: Martin v. Asbury Park, 111 N.J.L. 364 (E. & A. 1933).
Based upon the above I find that the lease herein was executed by the defendant under its proprietary or business powers and must, therefore, be construed as the court would construe a lease with an individual or business corporation *300 under like circumstances. That necessitates a construction as a private lease and not as a public document.
Therefore, I conclude that the words and phrase "for the duration of the war," as used in said lease, was intended by the parties thereto to mean for the duration of the actual hostilities, that is, the shooting war, which it has been stipulated terminated on or about September 2, 1945.
I, therefore, find as a fact that the minimum guarantee for the year of 1950 under said lease was $20,000. Since the plaintiff paid for said year the sum of only $15,405.87, I will order a judgment on said counterclaim in favor of the defendant and against the plaintiff for the difference, to wit, the sum of $4,594.13.