**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2878-19

ABRAMSON-OBAL, LLC,

    Plaintiff-Appellant,

v.

SUKETU SHAH and
KEDAR SHAH,

    Defendants-Respondents.

_____

Argued February 25, 2021 – Decided April 20, 2021

Before Judges Whipple, Rose, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-7636-17.

Jeffrey R. Kuschner argued the cause for appellant (Jeffrey R. Kuschner and Steven J. Zweig, on the briefs).

Michael J. Forino argued the cause for respondents (Archer & Greiner, PC, attorneys; Patrick Papalia, of counsel and on the brief; Michael J. Forino, on the brief).

PER CURIAM

Plaintiff Abramson-Obal, LLC, appeals from a February 28, 2020 judgment following a bench trial in this commercial landlord-tenant dispute. We affirm in part, and reverse and remand for the reasons that follow.

Plaintiff owns a vacant commercial property in Saddle Brook. The premises consist of two partitioned commercial spaces, a 7,200-square-foot Bennigan's franchise restaurant, and a smaller adjacent restaurant, Steak and Ale. The restaurant had been leased to a different Bennigan's franchisor since 1979 but was vacated in 2008. The adjacent unit had also been vacant since 2008. Defendants, Suketu Shah and Kedar Shah, believed that the Bennigan's brand would be a successful venture, so plaintiff and tenant, Bennigan's Saddlebrook, LLC—of which defendants were sole members and principals—executed a twenty-year lease of the restaurant on November 9, 2011.

## I.

Under the lease, tenant's first rent payment was due 150 days from issuance of a certificate of occupancy (CO). The lease required tenant to pay plaintiff $12,000 per month for the first twenty-nine months. In the thirtieth month, rent would be reduced to $9,600 per month but would increase annually thereafter.

A-2878-19

In addition to monthly rent, tenant was responsible for fifty-five percent of the premises' property taxes, common area maintenance (CAM) charges, and a proportional share of plaintiff's insurance premiums. Plaintiff agreed to provide a monthly estimate of total CAM, property tax charges, and tenant's proportional share of insurance premiums as additional rent. At plaintiff's option, tenant could be responsible for late charges of ten percent of any monthly payment paid later than ten days after its due date. The lease also obligated tenant to pay "as [a]dditional [r]ent, all attorney[s'] fees and other expenses incurred by [plaintiff] in enforcing any of the obligations under this [l]ease . . . ."

The lease permitted plaintiff to terminate if tenant defaulted due to a voluntary bankruptcy petition. Section 14.06 of the lease sought to waive plaintiff's duty to mitigate related damages: "[Plaintiff] and [t]enant hereby expressly agree that [plaintiff] shall have no obligation or duty to mitigate or attempt to offset or reduce any damages which are or may be suffered by [plaintiff] as a result of [t]enant's default."

Further, Section 32.02(B) states:

> The receipt of [b]asic [r]ent or [a]dditional [r]ent by [plaintiff], with knowledge of any breach of this [l]ease by [t]enant or of any default on the part of [t]enant in the observance or performance of any of

3

the conditions or covenants of this [l]ease, shall not be deemed to be a waiver of any provision of this [l]ease.

Section 32.16 of the lease contains a fee-shifting provision that allows a prevailing party to "be entitled to recover from the non-prevailing party its costs of court, legal expenses and reasonable attorneys' fees."

Defendants signed the lease and executed a separate personal Guaranty of Lease (Guaranty). Article XXX of the lease references the Guaranty, stating:

> This [l]ease is contingent upon the unconditional guarantee of the terms and conditions of this [l]ease [a]greement by Kedar Shah and Suketu Shah (collectively the "[g]uarantors"). . . . [T]he guarantors jointly, severally and unconditionally guarant[ee] all of the terms and conditions of the [l]ease. Thereafter, during the remainder of the [t]erm, [t]enant shall provide a "good guy" [g]uaranty.[1]

The Guaranty was executed simultaneously with the lease and sets forth the guarantors' obligations. It provides in relevant part:

> (a) During the period from the [c]ommencement [d]ate through the end of the twenty-ninth month of the [l]ease following the [r]ent [c]ommencement [d]ate, the [g]uarantors jointly, severally, and unconditionally guarantee to the [l]andlord . . . the full and punctual performance and observance by [t]enant of all of the terms, covenants and conditions in the said [l]ease

---

[1] A "good guy guaranty" provision limits the liability of a personal guarantor when a lease is terminated early under certain conditions.

A-2878-19

contained on [t]enant's part to be kept, performed or observed.

(b) Notwithstanding any limitation set forth in paragraph 1(a) above, in the event that this lease is terminated as a result of [t]enant committing an [e]vent of [d]efault at any time from the [c]ommencement [d]ate through the end of the tenth [l]ease [y]ear, the [g]uarantors shall guaranty the repayment to [l]andlord of the unamortized cost of the commission payable to the [b]roker . . . .

The Guaranty also holds defendants responsible for plaintiff's "reasonable attorneys' fees and all costs and other expenses incurred in any collection or attempted collection or in any negotiations relative to the obligations hereby guaranteed or enforcing this Guaranty of lease against the Guarantor."

In October 2014, plaintiff and tenant executed an Amendment to Lease and Settlement Agreement (Lease Amendment), which allowed the parties to resolve and settle in full all claims accruing through the date of signing. In addition to settling disputes between the parties for various nominal charges, the Lease Amendment provided a $5,000 monthly rent deferment for a one-year period. After one year, tenant was required to pay back the deferred rent in monthly $2,000 increments over thirty months.

Defendants also executed an "Amendment to and Reaffirmation of Guaranty" (Reaffirmation) that extended their Guaranty period until full payment of the deferred rent. In that document, defendants "ratif[ied] and confirm[ed] their agreement to guarantee the payment of each and every liability of [t]enant and every other obligation" to plaintiff as set forth in the Lease, Guaranty, and Lease Amendment.

## II.

In January 2017, plaintiff received notice that tenant had filed a Chapter 11 bankruptcy petition. Plaintiff did not make efforts to relet the restaurant upon learning of the bankruptcy filing. Defendants attempted to restructure the business, hoping to keep the space but rebrand the restaurant. Defendants continued to pay rent and additional charges between January 2017 and May 2017.

However, in May 2017, tenant's Chapter 11 bankruptcy case was converted to a Chapter 7 liquidation, and the bankruptcy trustee rejected the lease. Tenant abruptly ceased operations, and defendants turned over the keys. Plaintiff did not invoice defendants upon repossession of the restaurant. Plaintiff lawfully removed and auctioned most of the kitchen equipment tenant left behind, netting approximately $25,000. After plaintiff regained

A-2878-19

possession, in June 2017, it retained the Goldstein Group to market the restaurant.

Goldstein's President, Charles Lanyard, was responsible for marketing the restaurant. Under the listing agreement between Goldstein and plaintiff, Goldstein would receive a five percent commission based on the total rent received for up to fifteen years, or four percent of any gross sales price for obtaining a buyer. Goldstein advised that the current market rate for the restaurant was less than tenant's rent in the Lease and Lease Amendment. A potential tenant would likely seek less space than the restaurant offered, according to Goldstein, and plaintiff was unlikely to secure more than a five-year commitment from any new tenant. Goldstein and Lanyard were familiar with the difficulties of leasing space at that location, as they had been trying to lease the adjacent unit for approximately four years to no avail.

Within two months of repossession, plaintiff received a letter of intent (LOI) from Brothers BBQ.[2] After some discussion, plaintiff countersigned a

---

[2] During the time immediately following the marketing of the restaurant, plaintiff received inquiries from other interested parties. In June 2017, plaintiff received an LOI for the adjacent unit and engaged in subsequent lease discussions with a pet daycare facility, but plaintiff opted not to pursue the deal, fearing it could dissuade potential lessees of the restaurant space. In November 2017, the Meadowlands Transportation Brokerage Association

A-2878-19

revised LOI in August 2017. Under the terms of the LOI, Brothers BBQ would lease 10,000 square feet—the entire restaurant and part of the adjacent unit, at rental rates within plaintiff's expected range—for a ten-year term with two five-year renewal options, and with rent payment to commence as soon as 120 days after lease signing. Plaintiff's attorneys drafted a lease reflecting the terms of the LOI. The Brothers BBQ lease would have netted plaintiff between $236,000 and $547,000 more than would have been due from tenant's Bennigan's lease. However, when plaintiff received an LOI from a prospective purchaser, plaintiff abandoned the Brothers BBQ deal.

The prospective purchaser, Jack Daniels Motors (JDM), submitted an LOI in September 2017. Under its initial terms, JDM would lease the entire restaurant space for use as a vehicle storage facility. The LOI requested a fifteen-year lease term with three five-year renewal options. JDM would pay rental rates higher than those proposed by Brothers BBQ. Like Brothers BBQ, the JDM deal would have netted plaintiff more than tenant's unbreached lease, and rental payments would have commenced only sixty days after lease signing. Plaintiff ultimately rejected the JDM lease discussions and opted

---

expressed interest in purchasing the premises for $5,250,000 to be used as a bus parking site. Plaintiff did not further pursue that deal.

instead to pursue an outright sale of the premises to JDM. JDM submitted an LOI for purchase and sale of the premises in September 2017.

### III.

In November 2017, plaintiff brought a complaint against defendants seeking compensatory damages pursuant to the lease, Guaranty, Lease Amendment, and Reaffirmation. Plaintiff sought $416,294.74 in unpaid rent and additional rent from May 2017 to November 2019, $22,000 in deferred rent due under the Lease Amendment; $58,135.61 in unamortized brokers' commissions due under the Guaranty; legal fees for enforcement of the lease and bringing the lawsuit, totaling $59,764.21; an upward adjustment of $2,195.53, representing an unbilled portion of additional rent from 2016; and $60,879.62 in unintentionally omitted charges for which tenant had not been billed since 2015.

Shortly thereafter, in December 2017, plaintiff and JDM executed a purchase and sale agreement for a purchase price of $4,750,000, expressly contingent upon JDM's receipt of non-appealable zoning approvals for the premises. Once under contract, plaintiff instructed Goldstein to cease its marketing activities.

A-2878-19

JDM sought a use variance and other bulk variances from the Township of Saddle Brook. The Township Zoning Board of Adjustment held a hearing in May 2018, and all variances and plans were approved in June 2018. However, a neighboring property owner threatened to appeal the grant of the variances to JDM. Under the threat of the complaint, JDM terminated the sales agreement for failure to obtain a non-appealable approval. The neighboring property owner filed a complaint in lieu of prerogative writ in July 2018. JDM assigned its rights in the complaint to plaintiff, which in turn settled with the property owner. Plaintiff's attempts to resurrect the JDM purchase afterward were unsuccessful.

After the collapse of that deal, and after Goldstein resumed its marketing of the premises, several additional entities expressed interest in purchasing the property.[3] Defendants' liability for breach of the lease was established in an

---

[3] In December 2018, Coremark Group, LLC, offered to purchase the premises for $4,500,000. In January 2019, D&M Tours offered to purchase the property for $4,500,000. Four different potential restaurants expressed interest between December 2018 and January 2019. All four opted not to move forward with lease negotiations when they were advised that all restaurant equipment had been removed.

In April 2019, Sitex Group offered to purchase the premises for $2,500,000. Plaintiff rejected Sitex's offer because it was too low, and demanded Sitex meet an asking price of $5,200,000. In May 2019, Zoltek

award of partial summary judgment in October 2019. A four-day bench trial on damage mitigation commenced soon after.

IV.

The trial court issued the judgment and accompanying written opinion being appealed on February 28, 2020. The court found the testimony of Abramson "inconsistent" and "less than credible" concerning attempts to find "a reasonabl[y] adequate replacement restaurant tenant." The court also found Lanyard "[e]qually less credible" due to "inherent conflict because of [his] financial interest in the outcome of this case."

The court found plaintiff's mitigation efforts unreasonable due to a history of inaction and indecisive actions by Abramson. Though the Brothers BBQ lease "show[ed] a viable rental stream of income," plaintiff terminated negotiations based upon the "sheer speculation" and inherently riskier nature

Realty offered to purchase the premises for $4,650,000. Plaintiff rejected this offer because of a financing contingency.

In June 2019, Manzo Doren Organization of Saddle Brook, LLC, offered to purchase the premises for $4,795,000. Also in June 2019, East Ridge Development, LLC, offered to purchase the premises for $4,000,000. In August 2019, Freshline Produce, LLC, offered to purchase the premises for $4,200,000. In September 2019, JSF Management, LLC, offered to purchase the premises for $4,900,000. In October 2019, the Greater Bergen Association of Realtors offered to purchase the property for $4,625,000. At the time of trial, plaintiff was still engaged with purchase and sale negotiations.

of the JDM sale. Despite Lanyard's credibility issues, the judge gave weight to Lanyard's description that Brothers BBQ was the "ideal tenant for the property." The judge stated that "[p]laintiff's actions were a total failure of effort to mitigate damages by securing another restaurant tenant [and] warrant[] entry of judgment in favor of the defendants on plaintiff's claim for rent due after surrender of the property."

The court concluded:

> Even accepting the analysis performed by and the testimony of [defendants' expert Louis Izenberg] limiting damages to one year, plaintiff failed to mitigate damages within one year of [tenant] vacating the property. Thus, plaintiff is not entitled to recover damages for base rent, additional rent, deferred rent and unamortized broker's commission . . . .

The court likewise denied plaintiff's request for "previously omitted charges" and all other damages. The court also denied plaintiff's request for attorneys' fees but allowed plaintiff to retain tenant's $24,000 security deposit.[4] This appeal followed.

---

[4] The lease contained a provision attempting to waive plaintiff's duty to mitigate; plaintiff pursued this issue at trial, though not on appeal. The trial court rejected the argument, finding the provision is unenforceable given New Jersey's strong public policy in favor of guaranteeing that landlords mitigate damages, and based on accepted principles of contract law.

V.

"Findings by the trial judge are considered binding on appeal when supported by adequate, substantial and credible evidence." Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974). "We must give deference to those findings of the trial judge which are substantially influenced by his or her opportunity to hear and see the witnesses and have the 'feel' of the case," as reviewing courts cannot. State ex rel. S.B., 333 N.J. Super. 236, 241 (App. Div. 2000) (quoting State v. Locurto, 157 N.J. 463, 471 (1999)). Thus, when we "conclude[] there is satisfactory evidentiary support for the trial court's findings, [the appellate court's] 'task is complete and it should not disturb the result.'" Slutsky v. Slutsky, 451 N.J. Super. 332, 344 (App. Div. 2017) (quoting Beck v. Beck, 86 N.J. 480, 496 (1981)).

Nevertheless, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). At the outset, although we defer to the trial judge's findings regarding credibility and agree that her findings regarding the reasonableness of plaintiff's efforts at mitigation are supported by the record, we are constrained to remand for further consideration of the judge's ultimate

13

conclusion that plaintiff is entitled to no recovery beyond its security deposit of $24,000.

## A.

Based on our review, we cannot overlook the conclusion that plaintiff was unable to mitigate damages before regaining possession of the premises in June 2017. Defendants' bankruptcy filing and the imposition of the automatic stay barred plaintiff from attempting to mitigate any damages during that period.

The automatic stay precludes creditors, including landlords, from undertaking "any act to obtain possession of property" from the debtor. 11 U.S.C. § 362(a)(3). The bankruptcy code naturally controls any potentially contrary state doctrine pursuant to the Supremacy Clause. See A.H. Robins Co., Inc. v. Dir., Div. of Taxation, 365 N.J. Super. 472, 478 n.3 (App. Div. 2004).

The trial court found "plaintiff made no effort to find a tenant between January 2017 and June 2017." It further concluded "[t]he record reveal[ed] a history of inaction . . . by . . . Abramson." The very next sentence of the opinion notes: "[u]pon receiving notice of the bankruptcy filing in January

14

2017, plaintiff expended zero efforts in reletting the space between January and June of 2017."

Defendants' legal status between their January 2017 bankruptcy filing until the rejection of the lease by the Chapter 7 Trustee in late May 2017 necessarily precludes any factual finding that plaintiff could have mitigated its damages during this period. That the lease regards a tenant's bankruptcy filing as a default-triggering event is of no moment. Defendants made plaintiff aware of their desire to retain the lease and rebrand the restaurant. Plaintiff only served defendants with a notice of default after tenant missed the May 2017 rent payment. Even still, federal bankruptcy statutes prevented plaintiff from taking any mitigation action. Thus, the trial court erred to the extent it gave any weight to plaintiff's failure to mitigate between January and June 2017.[5]

Plaintiff cites defendants' expert's claim that it would have taken one year to obtain a new, rent-paying tenant for the restaurant, arguing the trial court's failure to find non-mitigatable rental loss was error as a matter of law.

---

[5] There is little procedural history of defendant's bankruptcy proceeding contained in the record. As such, there is no indication the automatic stay was lifted at any time prior to rejection of the lease by the bankruptcy trustee.

Plaintiff also claims the trial court erred in finding plaintiff's failure to mitigate barred all recovery. We agree.

The law imposes on landlords a duty to mitigate damages by expending reasonable efforts to stem their losses. McGuire v. City of Jersey City, 125 N.J. 310, 320 (1991). The duty to mitigate damages relates to the amount of loss the landlord "could reasonably have avoided." Ingraham v. Trowbridge Builders, 297 N.J. Super. 72, 83 (App. Div. 1997) (emphasis added) (quoting Restatement (Second) of Contracts § 350, cmt. b (Am. Law Inst. 1981)). A landlord that fails to mitigate may nevertheless recover damages for unavoidable losses, or losses that would have been incurred even with reasonable mitigation efforts. Id. at 82-83. Therefore, a landlord's failure to mitigate does not preclude all recovery. Harrison Riverside Ltd. P'ship v. Eagle Affiliates, Inc., 309 N.J. Super. 470, 473 (App. Div. 1998).

The trial court explained "plaintiff failed to mitigate damages within one year of [tenant] vacating the property. Thus, plaintiff is not entitled to recover damages for base rent, additional rent, deferred rent and unamortized broker's commissions. . . ." (emphasis added). Because mitigation failures do not serve to bar all recovery, the trial court misapplied the law, and this matter must be remanded.

16

Notwithstanding plaintiff's failure to reasonably mitigate after it retook possession, plaintiff suffered unavoidable damages resulting from tenant's breach. The trial court therefore wrongfully concluded that plaintiff's failure to reasonably mitigate barred any recovery whatsoever. At a bare minimum, plaintiff would be entitled to recovery for the period between tenant's breach and the date at which the court determined a replacement tenant would have been found.

Defendants' expert, Izenberg, inspected the premises, reviewed market data, and then addressed how long "it [should] typically take within the market to rent a property and the amount to which it should rent for." The trial court found defendants' expert credible in view of his credentials and knowledge of the Northern New Jersey real estate market.

The court accepted Izenberg's opinion that it would have taken one year to relet the premises, but found "[e]ven accepting the analysis performed by and the testimony of [Izenberg] limiting damages to one year, plaintiff failed to mitigate damages within one year of [tenant] vacating the property." The court made no explicit holding that it would have taken one year to relet the premises because it erroneously decided plaintiff's failure to mitigate during the bankruptcy period, coupled with its failure to mitigate upon repossession,

barred all recovery. Therefore, the trial court's acceptance of Izenberg's conclusion about the one-year period forms a sufficient factual finding upon which to base damages calculation on remand.

If the trial court accepted Izenberg's testimony concerning the length for which the property would have remained vacant, plaintiff would be entitled to one year of rental damages for the period of unavoidable loss. Alternatively, if the trial court's consideration of Izenberg's conclusions fell short of a concrete factual finding about the length of time it should have taken plaintiff to relet the premises, the trial court must make this determination on remand.

B.

Plaintiff also argues the trial court erred in denying recovery for the deferred rent and the unamortized broker's commission. Additionally, plaintiff asserts the trial court erred in holding plaintiff waived previously omitted charges and an upward adjustment of past charges. Again, we agree. Because the amounts were owed upon breach of the lease, they are not subject to or affected by any mitigation efforts.

"[A] lease is like any other written contract. When either party fails to perform a covenant, the injured party may bring an action for damages for breach of covenant." Ringwood Assocs., Ltd. v. Jack's of Route 23, Inc., 153

18

N.J. Super. 294, 309 (Law Div. 1977). The "lessor of commercial property is required to mitigate damages arising from breach of a lease. . . ." McGuire, 125 N.J. at 320. Contract damages are recoverable for loss when the breaching party had reason to foresee as a probable result of the breach when the contract was made. Totaro, Duffy, Cannova & Co., L.L.C. v. Lane, Middleton & Co., L.L.C., 191 N.J. 1, 13 (2007) (quoting Restatement (Second) of Contracts § 351 (1979)).

Here, two separate contracts set forth the guarantors' legal repercussions upon tenant's breach of the lease. The Guaranty obligated defendants to pay the unamortized portion of the broker's commission. Plaintiff presented unrefuted evidence at trial that this amount—the total amount plaintiff paid the broker who secured tenant's lease, divided by the percentage of time over a ten-year span that tenant remained in the space—equaled $58,136.61. Defendants had every reason to foresee owing this portion upon lease execution in the event tenant breached the lease.

Similarly, the Lease Amendment deferred a portion of rent for a year and set a thirty-month repayment period. Tenant stopped paying rent eleven months from the expiration of this thirty-month time frame. Unrefuted testimony at trial indicated that defendants owed $22,000 in deferred rent.

19

This amount, too, was reasonably foreseeable upon breach. Accordingly, common law contract principles dictate that because the tenant breached the lease, defendants as guarantors owe the unamortized portion of the broker's commission, as well as the balance of the deferred rent owed under the Lease Amendment.

## C.

Plaintiff also sought payment for charges it inadvertently did not seek from tenant during its occupancy of the premises. After execution of the Lease Amendment, plaintiff's in-house accountant altered the way in which it billed certain charges, resulting in a "mistake" that led to plaintiff underbilling the tenant by $60,879.62. This amount includes tenant's "pro rata share of insurance paid by the landlord, the quarterly sprinkler charge, and the management fee." The amount also includes the late fee, ten percent of the rent and additional rent due, for each month it went unpaid from May 2017 to November 2019.

The lease also called for a year-end accounting to adjust, upwards or downwards, maintenance and tax charges either owed or due the tenant from the prior calendar year. The lease required plaintiff to provide notice of same to tenant "[w]ithin approximately 120 days of the end of each calendar year."

A-2878-19

Plaintiff did not provide notice to tenant or defendants of the $2,195.53 owed to plaintiff prior to tenant's vacating the restaurant.

Plaintiff's accountant explained it stopped sending invoices to tenant or defendants when "they had vacated the premises, and it appeared to be an exercise in futility. We had no expectation that they were going to make good on any invoices that we would send them." "There was no intent on our part to not . . . charge them. It was just . . . a fruitless exercise to be generating rent bills when . . . they made it clear they weren't going to pay."

The trial court denied plaintiff's claim for the omitted charges because:

> Plaintiff made no effort to provide [tenant] with corrected invoices during their tenan[cy] up to and including through the bankruptcy. Similarly, plaintiff made no effort to provide defendants with the corrected statements immediately after [tenant's] obligation was discharged due to bankruptcy. Finally, plaintiff failed to perform its obligation pursuant to the lease because the charges were not presented within 120 days of each calendar year.
>
> Even more troubling is the fact that plaintiff never provided notice to defendants as personal guarantors of the accruing charges. Although plaintiff had no expectation that [tenant] would pay rent and expenses between May 2017 and November 2019, plaintiff was not relieved of the obligation to provide notice of the charges and commission due to defendants as personal guarantors on a monthly basis. Plaintiff cannot passively watch the charges accrue

21

and then wait until commencement of litigation to seek payment.

"The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference." Knorr v. Smeal, 178 N.J. 169, 177 (2003).

Here, plaintiff had rights to the above charges through tenant's obligations under the lease. The record does not reflect that plaintiff abandoned those rights. Accordingly, the trial court incorrectly found plaintiff was not entitled to the previously omitted charges.

D.

Finally, plaintiff argues it should have been awarded attorneys' fees as additional rent for expenses incurred to enforce the lease. The lease required tenant to pay "as [a]dditional [r]ent, all attorney[s'] fees and other expenses incurred by [plaintiff] in enforcing any of the obligations under this lease. . . ." Additionally, Section 32.16 of the lease provides:

> In the event any party to the lease, including any Guarantor hereunder, should bring suit against the other party in respect to any matters provided for herein, the prevailing party shall be entitled to recover from the non-prevailing party its costs of court, legal expenses and reasonable attorneys' fees.

22

At trial, plaintiff submitted proofs regarding legal fees incurred to enforce tenant's breach of the lease.  The trial judge accepted invoices from two firms, one of which represented plaintiff's interests in the bankruptcy proceeding, and she reserved plaintiff's ability to submit its invoices in the event it prevailed.

Because the court ruled for defendant, plaintiff was not awarded fees as a prevailing party.  The court decided plaintiff was "not entitled to attorneys' fees related to the bankruptcy matter since plaintiff offered no proofs regarding any determinations made by the bankruptcy trustee with regard to the fees and costs associated with [tenant]."

Typically, prevailing parties may recover reasonable attorneys' fees.  N. Bergen Rex Transp. v. TLC, 158 N.J. 561, 570 (1999); Singer v. State, 95 N.J. 487, 494 (1984).  A two-pronged standard determines when a party has prevailed.  First, the fee-seeking party "must demonstrate that its lawsuit was causally related to securing the relief obtained."  Kellam Assocs., Inc. v. Angel Projects, LLC, 357 N.J. Super. 132, 139 (App. Div. 2003).  This "requires a factual causal nexus between the pleading and the result ultimately achieved."  Ibid. (citing N. Bergen Rex Transp., 158 N.J. at 570).  Second, the fee-seeking party must "demonstrate that the relief it obtained had some basis in law."  N.

Bergen Rex Transp., 158 N.J. at 571. Under the second prong, "[t]he party seeking attorneys' fees need not recover all relief sought, but rather, there must be 'the settling of some dispute that affected the behavior of the [party asked to pay attorneys' fees] towards the [party seeking attorneys' fees].'" Ibid. (alterations in original) (quoting Davidson v. Roselle Park Soccer Fed'n, 304 N.J. Super. 352, 357 (Ch. Div. 1996)).

When a prevailing party "has achieved only limited relief in comparison to all of the relief sought, the [trial] court must determine whether the expenditure of counsel's time on the entire litigation was reasonable in relation to the actual relief obtained . . . and, if not, reduce the award proportionately." Id. at 572 (alterations in original) (citing Singer v. State, 95 N.J. 487, 500 (1984)).

Based on the above, plaintiff will prevail in some presently unquantifiable measure upon remand. There is a causal nexus between plaintiff's complaint and the relief it might obtain. Thus, if plaintiff is a prevailing party, pursuant to the lease and Guaranty, defendants owe plaintiff reasonable attorneys' fees. On remand, the court will have to assess the reasonableness of these fees, likely reducing the total fee award by a percentage of the total relief obtained versus the relief plaintiff sought.

## VI.

For these reasons, we do not disturb the trial court's finding regarding the unreasonableness of plaintiff's mitigation efforts; however, we reverse the order to the extent that it precluded all recovery, and remand the matter for the trial court to calculate damages based upon the period of unavoidable loss.

On remand, because the trial court already accepted expert testimony limiting the unavoidable loss period to one year, it need only address the narrow question of rental damages due to plaintiff for that discrete length of time. As set forth, notwithstanding the rent and additional rent due for the unavoidable loss period, defendants owe the deferred rent, unamortized broker's commission, as well as the previously omitted charges. The trial court should also determine the reasonableness of plaintiff's legal fees due under the lease and the Guaranty.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2878-19